IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 18, 2015 Session

## STATE OF TENNESSEE v. BLAKE EDWARD CHILDRESS

**Appeal from the Criminal Court for Hamblen County**
**No. 12CR257      John F. Dugger, Jr., Judge**

_____

**No. E2014-02142-CCA-R3-CD – Filed November 25, 2015**

_____

Defendant, Blake Edward Childress, was convicted by a Hamblen County Jury of incest. He was sentenced to six years in incarceration. On appeal, he argues that (1) the trial court improperly denied a motion to suppress; (2) the trial court improperly allowed introduction of evidence of prior bad acts; and (3) the evidence was insufficient to support the conviction. After a review, we determine Defendant properly invoked his right to counsel and, thereafter, was improperly subjected to continued discussion by a detective that produced an incriminating response. Consequently, the subsequent confession by Defendant was obtained in violation of his Fifth Amendment right to counsel, and the trial court should have granted the motion to suppress. We determine the subsequent introduction of the confession at trial was not harmless error, and the judgment of the trial court is reversed and remanded for new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

W. Joe Bell, Knoxville, Tennessee, for the appellant, Blake Edward Childress.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilbur, Senior Counsel; and Dan Armstrong, District Attorney General, for the respondent, State of Tennessee.

**OPINION**

This is Defendant's direct appeal from his conviction in Hamblen County for the crime of incest.

*Factual and Procedural History*

A police report was filed on January 31, 2011, in Morristown, Tennessee. The report alleged that Defendant committed incest against his half-sister[1], M.B.[2], during an incident that occurred around Thanksgiving of 2011 when the victim was sixteen and Defendant was twenty-two. Defendant was indicted by the Hamblen County Grand Jury for incest.

*Motion to Suppress*

Prior to trial, Defendant filed a motion to suppress. At the hearing, Detective Christian Newman of the Morristown Police Department testified that she was responsible for investigating a complaint made by Defendant's half-sister to a counselor and reported to the police by the counselor. The report indicated that the victim was first "molested" by Defendant at the age of seven. Defendant moved into her home temporarily when she was sixteen, and Defendant started abusing her again at that time by forcing her "to perform oral sex on him."

Detective Newman met with the victim prior to meeting with Defendant. She explained it was the policy of the Morristown Police Department that no audio or video recording was taken during interviews of suspects. At the time she met with Defendant, he was incarcerated on unrelated charges. Detective Newman spoke with Defendant in the attorney room, taking "basic personal history" and eventually "read[ing] him his *Miranda* rights and explain[ing] that to him and ask[ing] him if he would agree to talk to me, and he did agree to talk to me and signed that waiver at that time." After telling Defendant why she was there, his "face turned red." Defendant initially denied the allegations until, at one point, he stated he would "talk . . ., but [he] want[ed] to run it by an attorney first." At that point, Detective Newman's questioning was "done" but she proceeded to ask Defendant a "logistical question"[3] about whether he would be willing to submit to a lie detector test. Defendant said "No." Detective Newman commented, "[I]f what [the victim] is saying is true, you shouldn't take the test. . . ." At that point, Defendant told Detective Newman, "I'll tell you now what happened, but I won't write anything down, and I won't sign anything."

---

[1] Defendant and M.B. have the same mother and different fathers.

[2] It is the policy of this Court to refer to victims of sexual offenses by their initials.

[3] Detective Newman explained that it was a "logistical question" in the sense that Defendant was incarcerated in Hamblen County at the time and she would "have had to make arrangement with the Morristown Police Department . . . [to] transport [Defendant] for the test."

Defendant proceeded to tell Detective Newman his version of the events that took place around Thanksgiving. According to Defendant, the victim was intoxicated and performed oral sex on him. Defendant claimed that it was her idea. Immediately after Defendant finished talking, Detective Newman took handwritten notes. In part, they stated:

> What [the victim] said happened is what happened. I said, ["]Oral sex?["] And he said, ["]She came downstairs and came to me.["] I told him that [the victim] said it happened two times in the fall of 2011[,] and he said that was right. I asked if [he] performed oral sex on [the victim,] and he said, ["]I never touched her. She did it to me.["] I asked if [the victim] put her mouth on his penis and he said, ["]Yes.["] He said it happened in the basement and he had felt real bad since he did that. He went on to say that he had been suicidal in the past and felt like he needed to go to Lakeshore. I told him that he needed to see the jail nurse.
>
> . . . .
>
> When he was telling me what happened[,] he said that [the victim] was intoxicated and came onto him.

Defendant testified at the hearing on the motion to suppress. He claimed that the detective did not read him the waiver of rights "word for word." At the time, he thought that he was being questioned about "something that [he] had already been questioned about with [his] daughter." He was "surprised" when Detective Newman informed him it was about his step-sister. Defendant insisted that he told Detective Newman that he "wanted to speak with a lawyer" but that the questioning did not stop. Defendant emphatically testified that the contents of Detective Newman's statement were "not what I said."

The trial court determined that Defendant "clearly knew his rights" and "invoked his right to counsel . . . , when [Defendant] said [he] want[ed] to talk to his attorney first." However, Defendant "initiated the response, initiated his statement and agreed, at that time, to basically waive his *Miranda* rights and give a statement, and that he did so voluntarily." The trial court denied the motion to suppress, deeming the case a "matter of credibility for the jury to determine who they believe."

*Trial*

At trial, Detective Newman testified that she had worked for the Morristown Police Department for twenty-six years. The police report that initiated the investigation was filed by Dr. Reno, a clinical psychologist from Knoxville, Tennessee. As a result of

the report, Detective Newman contacted the victim, and Defendant was identified as the suspect.

As explained at the hearing on the motion to suppress, Detective Newman spoke with Defendant, who was already incarcerated on unrelated charges. Detective Newman first read Defendant his *Miranda* rights. Defendant signed a waiver of rights. Detective Newman informed Defendant of the allegations. Defendant's "face turned red, he kind of acted scared like - - well like a deer in headlights. . . ." Defendant initially denied the allegations, then asked to "run it by" his attorney.

At that point, Detective Newman ceased questioning. Defendant "reinitiated the conversation," telling Detective Newman that the victim performed oral sex on him but that it was consensual and initiated by the victim. Defendant confirmed that he placed his penis into the victim's mouth in the basement of the home that belonged to their mother.

The victim and Defendant's mother, S.S.,[4] testified. She confirmed that Defendant, his infant child, and the mother of the child moved in to her basement for a while prior to the incident. S.S. was going through a divorce at the time and described the relationship with her husband at the time as "not good."

M.B. testified that she was born in 1995. At the time of the trial she was eighteen years of age. At the time of the incident, she was sixteen. The victim testified that around Thanksgiving, she was downstairs hanging out with Defendant "because that's where his room was at that time." They were playing Nintendo. Defendant "turned the TV off and he told [her] to give him a blow job." The victim said "no" and tried to leave. Defendant would not let her leave. He "pulled his pants down" and "his penis was erect." Defendant "forced [her] head down on his penis." She described it as "kind of a struggle" but she "just gave in to get it over with." Defendant ejaculated in her mouth at about the same time she heard her parents return home. She went upstairs. She did not tell anyone about the incident until mid-January because she did not want to cause a "disturbance" in the household. The victim told Dr. Reno after Defendant moved out, and Dr. Reno reported the abuse to the police.

The victim's father testified on behalf of the defense at trial. He recalled Defendant living with them off and on in the fall of 2011 "depending on if he was there, staying there or not, or if he was incarcerated at the time." He testified that Defendant did not have a job and often stayed out at night and slept during the day. He did not think Defendant was living at the house at the time the victim reported the incident. At the time of trial, the victim's father and S.S. were divorced.

---

[4] We have chosen to refer to the mother of the victim and Defendant by her initials in order to protect the identity of the victim.

Defendant testified at trial. He explained that he lived at home with his mother in the fall of 2011. He normally stayed "up all night" and slept most of the day. He was not working the majority of the time he was staying at the house. In his free time he liked to "produce music and record music with a couple of friends."

Defendant testified that on November 24, 2011, the date of the alleged incident, his mother was home all day. She asked Defendant and his friend to pick up the victim from her friend's house. After Defendant and his friend picked up the victim, they returned to the house where everyone ate together. Defendant left after eating "take-out from a place in Jefferson City" and spent the night with his friend. The next day he could not recall specifically what he was doing but thought that he was sleeping at his friend's home.

Defendant recalled talking to Detective Newman at the jail while "he was incarcerated" for a violation of misdemeanor probation. Defendant also admitted that he had prior charges for reckless endangerment and aggravated assault with a firearm. Defendant "pled guilty" to those felonies because he "did them."

Defendant admitted that he signed the waiver before he knew what Detective Newman came to talk to him about at the jail. Once she explained the allegations, Defendant was "hurting" and wanted to talk to an attorney. Defendant called Detective Newman a "liar" and denied making any of the statements to the Detective after he invoked his right to counsel. He claimed the "allegations are a lie. There had never been nothing [sic] going on before."

At that point, counsel for the State argued that Defendant "opened the door for the state to put on evidence of other acts. . . ." The trial court determined Defendant "opened the door the way he answered the question."

The State called the victim in rebuttal. The victim testified that there were other incidents that occurred when Defendant moved back in to the house in September. The victim explained that "this [abuse] happened when I was a child, and [Defendant] brought that up that night [when he moved back in to the house] and asked how I felt about that and if I would like those things could happen again. . . ." The victim described another incident wherein Defendant was in her bedroom and asked for a "blow job." The victim's younger brother knocked on the door interrupting Defendant, and Defendant left the room. Defendant denied these additional allegations.

The jury found Defendant guilty of incest. After a sentencing hearing, the trial court sentenced Defendant to six years in incarceration as a Range I, standard offender. Defendant appeals, arguing that the trial court improperly denied the motion to suppress;

that the evidence was insufficient; and that the trial court improperly allowed evidence of Defendant's prior bad acts when he claimed that nothing had ever happened between him and the victim.

*Analysis*

*Motion to Suppress*

On appeal, Defendant argues that the motion to suppress should have been granted because he properly invoked his right to counsel and Detective Newman continued the interrogation in a manner intended to elicit incriminating statements. The State insists that Defendant waived *Miranda* rights after invoking his right to counsel because he responded to Detective Newman's "non-interrogatory question about whether he would submit to a polygraph examination." According to the State, the question was not designed to elicit an incriminating response, and any confession by Defendant was voluntary and spontaneous.

In reviewing a trial court's ruling on a motion to suppress, this Court will uphold the trial court's findings of fact "unless the evidence preponderates otherwise." *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citing *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013)). Witness credibility, the weight and value of the proof, and the resolution of conflicts in the proof "are matters entrusted to the trial court as the trier of fact." *Id.* at 529. "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court's resolution of questions of law and application of the law to the facts are reviewed de novo with no presumption of correctness. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). When reviewing a trial court's ruling on a motion to suppress, this Court "may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012) (citing *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998)).

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); *see also State v. Turner*, 305 S.W.3d 508, 515 (Tenn. 2010). When a defendant is in custody[5] and subject to

---

[5] Merely being in custody on another charge does not automatically trigger the "in custody" portion of the *Miranda* requirement. *State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998).

> [A]n inmate is not in custody for *Miranda* purposes unless there is an added imposition
> on the inmate's freedom of movement. Relevant to this determination is (1) the language

interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Encompassed within the federal and state constitutional provisions is the right to counsel. *See id.* at 444. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 455 (1994). In *Davis*, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)).

"When a suspect invokes the right to counsel, police must cease questioning until counsel is present" or the suspect initiates further conversation with the police. *State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003) (citing *Miranda*, 384 U.S. at 444-45; *Edwards v. Arizona*, 451 U.S. 477 (1981); *State v. Stephenson*, 878 S.W.2d 530, 548 (Tenn. 1994)). A suspect can invoke the right to counsel "in any manner and at any stage of the process[.]" *Miranda*, 384 U.S. at 444-45. As soon as the right to counsel is invoked, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. *Edwards*, 451 U.S. at 487. In *Davis*, the United States Supreme Court stated that although it is a good policy for law enforcement to clarify whether a suspect has actually asked for an attorney when the suspect's request is ambiguous, it "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Davis*, 512 U.S. at 461. The Court explained, "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62.

When a defendant in custody initially waives his right to counsel and insists that he later revoked that waiver, the defendant bears the burden of proving he revoked the waiver and clearly asserted his right to counsel. *Turner*, 305 S.W.3d at 519. Of course, the waiver must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 467. The test for voluntariness under the Tennessee Constitution is broader and more

---

used to summon the inmate, (2) the physical surroundings of the interrogation, (3) the extent to which he is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain the inmate. We agree that this standard is best suited to determine whether *Miranda* warnings must precede questioning in a prison setting, given the fact that a prisoner would always believe that he was not free to leave the prison.

*Id.* There is no question whether Defendant herein was in custody. In fact, Detective Newman made certain that Defendant understood this much by informing him of his rights.

protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

In this case, no one disputes that Defendant initially made a voluntary, knowing, and intelligent wavier of his rights to counsel and against self-incrimination prior to the interview with Detective Newman. Instead, Defendant argues that once he learned of the allegations against him he "unequivocally invoked his right to counsel under *Miranda* and *Edwards*." The trial court and the State agree but insist that even after invoking the right to counsel, Defendant spontaneously initiated further conversation with police wherein he confessed to the crime.

Thus, the first question we must address in the case herein is whether Defendant unequivocally invoked his right to counsel after his initial *Miranda* waiver. The issue of whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. *Climer*, 400 S.W.3d at 556 (citing *Turner*, 305 S.W.3d at 514-15).[6] In order to be unequivocal, a suspect is required to "articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459; *Turner*, 305 S.W.3d at 516; *Saylor*, 117 S.W.3d at 246.

Bearing these tenants in mind, we turn to the case herein. After being confronted with allegations that he forced his half-sister to perform oral sex on him, Defendant told Detective Newman, "I will talk to you, but I want to run it by an attorney first." We deem Defendant's statement a clearly communicated desire to consult with counsel and is analogous to other statements deemed to be unequivocal invocations of the right to counsel. *See, e.g.*, *Edwards*, 451 U.S. at 479 ("I want an attorney before making a deal."); *Turner*, 305 S.W.3d at 522 ("Get me a lawyer."); *State v. Koffman*, 207 S.W.3d 309, 319 (Tenn. Crim. App. 2006) ("I want to call [a judge] and [a federal public defender]."); *State v. Tidwell*, 775 S.W.2d 379, 387 (Tenn. Crim. App. 1989) ("I'd like to

---

[6] Seemingly contradictory, in *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996), this Court stated that "[w]hether the suspect made an equivocal or unequivocal request for counsel is a question of fact." In *Turner*, we recognized the common practice among this Court and noted:

> In practice, however, our intermediate appellate court has more properly considered the issue as a mixed question of law and fact and has not afforded deference to the rulings of trial courts. This is consistent with the approach taken in other jurisdictions. In fact, we were unable to find any reported decisions from appellate courts outside of this state that have reviewed the nature of a request for counsel as purely a question of fact. *See, e.g.*, *People v. Porter*, 9 N.Y.3d 966, 848 N.Y.S.2d 583, 878 N.E.2d 998, 999 (2007); *State v. Dumas*, 750 A.2d 420, 425 (R.I. 2000); *Commonwealth v. Redmond*, 264 Va. 321, 568 S.E.2d 695, 697-98 (2002).

305 S.W.3d at 514.

call a lawyer before I discuss that."); *State v. Michael Lee McCormick*, No. E2003-02689-CCA-R9-DD, 2004 WL 2583903, at *11 (Tenn. Crim. App. Nov. 15, 2004) ("I'd be willing to [cooperate.] I'd like to have a lawyer at this point."), *perm. app. denied* (Tenn. Mar. 21, 2005). Thus, the trial court correctly determined that Defendant unequivocally invoked his right to counsel. At that point, Detective Newman was constitutionally obligated to cease all questioning immediately.

Our inquiry, however, does not end as Detective Newman continued to address Defendant after he invoked the right to counsel. As mentioned above, Detective Newman asked what she described as a "logistical" question about Defendant's amenability to taking a lie detector test. Defendant replied, "No." Detective Newman commented, "If what [the victim] is saying is true, you shouldn't take the test." At that point, Defendant said he would "tell [the detective] now what happened, but [he] w[ould not] write anything down and [he would not] sign anything." According to Detective Newman, Defendant "began to talk . . . and he told his version of what had happened" at that point.

Once a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. In *Edwards*, the United States Supreme Court essentially established a "second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him . . . .'" *McNeil v. Wisconsin*, 501 US 171, 176-77 (1991) (quoting *Edwards*, 451 U.S., at 484-85). This has been interpreted to mean that counsel must be present. *Minnick v. Mississippi*, 498 U.S. 146 (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The *Edwards* rule, moreover, is not offense specific. Said differently, at the point a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be re-approached regarding any offense unless counsel is present. *Arizona v. Roberson*, 486 U.S. 675 (1988).

The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 434-35)). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id.* (citing *Dickerson*, 530 U.S. at 433). It has long been held

that for a statement to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.* (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)); *see also State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) (noting that "for a confession to be involuntary, it must be the product of coercive state action").

This is not a case where, after invocation of the right to counsel, questioning came from or statements were initiated by the defendant. *See, e.g.*, *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (concluding that the defendant's question, "Well, what is going to happen to me now?" evinced "a willingness and desire for a generalized discussion about the case" and "was not merely a necessary inquiry arising out of the incidents of the custodial relationship"); *State v. March*, 395 S.W.3d 738 (Tenn. Crim. App. 2011) (determining defendant did not invoke the right to counsel, was not being interrogated, and initiated conversation with detective over a two-hour period such that statements were not subject to suppression); *State v. Ezra Shawn Ervin*, No. E1999-00287-CCA-R3-CD, 2001 WL 15832 (Tenn. Crim. App. Jan. 9, 2001) (holding that statement volunteered by defendant during his arrest that he "didn't rob that Krystal, that manager just don't like me" was admissible because it was not the result of interrogation and was initiated by the defendant), *perm. app. denied* (Tenn. June 4, 2001); *State v. Ensley*, 956 S.W.2d 502, 510-11 (Tenn. Crim. App. 1996) (determining that, when defendant was not in custody and "just started talking," statements were admissible at trial). In these cases, the defendants effectively re-waived their rights by making new efforts to speak with the authorities without the functional equivalent of interrogation.

In this case, the statements occurring after Defendant invoked his right to counsel came directly from the Detective, not Defendant. The United States Supreme Court in *Rhode Island v. Innis* provided the following guidance for lower courts:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are *reasonably likely* to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the

police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301-02 (emphasis added). In *Innis*, the defendant was arrested as a suspect in the armed robbery of a cab driver; however, the defendant did not have a weapon in his possession at the time of his arrest. *Id.* at 294. On three separate occasions after his arrest, the police provided the defendant with *Miranda* warnings. *Id.* The third time the defendant met with an officer, he told the officer he understood his rights, and asked to speak with an attorney. *Id.* A police captain instructed three patrol officers to transport the defendant to the police station and that they were not to question, intimidate, or coerce the defendant. In the police car on the way to the station, two of the officers conversed about the missing gun, one expressing concern about the possibility that one of the children from a nearby school for handicapped children might find the missing weapon and hurt themselves. *Id.* When an officer remarked that "it would be too bad" if a little girl "pick[ed] up the gun and maybe kill[ed] herself," the defendant interrupted the officers' conversation and revealed the location of the gun. *Id.* at 294-95. The United States Supreme Court rejected the defendant's argument that the officers' conversation amounted to interrogation because the "record in no way suggest[ed] that the officers' remarks were designed to elicit a response." *Id.* at 302. Furthermore, no evidence suggested "that the officers were aware that the [suspect] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." *Id.* at 302. In other words, the suspect was not subjected to the "functional equivalent" of express questioning for purposes of *Miranda*. *Id.* at 303. Thus, *Innis* recognizes that express questioning is not necessary to trigger *Miranda* warnings, and that a conversation among officers within earshot of a suspect may constitute interrogation for purposes of *Miranda* when the suspect is in custody and the police are aware that their words or actions are reasonably likely to evoke an incriminating response. *Id.* In such cases, although an officer's intent may be relevant in determining "whether the officer should have known his or her words or actions were reasonably likely to invoke an incriminating response," the primary focus rests "upon the accused's perception rather than on the police officer's intent." *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (citing *Innis*, 446 U.S. at 301). *But see State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (observing that "[i]t is well established that questioning initiated by the defendant is not interrogation

in the *Innis* sense" (citing *Edwards*, 451 U.S. at 484)).[7] Thus, in order to determine if actions by the police constitute interrogation,

> we must remember the purpose behind [the] decision[ ] in *Miranda* . . . : preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.

*Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987). *But see State v. Andrew Mann*, No. E2010-00601-CCA-R3-CD, 2012 WL 184157, at \*7-8 (Tenn. Crim. App. Jan. 23, 2012) (determining officer's statement "[y]ou know exactly what you've done," after Defendant asked "what have I done" occurring prior to *Miranda* warning and notice of the charges against him did not amount to custodial interrogation reasonably likely to elicit an incriminating response such that defendant's action of "putting his head down and nodding yes" should be suppressed), *perm. app. denied* (Tenn. June 20, 2012).

Turning to the case herein, Detective Newman acknowledged at the hearing on the motion to suppress that her "questioning was done" at the point Defendant asked to "run it by an attorney." Despite that acknowledgment, the detective continued the conversation by asking Defendant if he would be "willing to take a lie detector test," in her estimation a "logistical question." Defendant replied, "No." Detective Newman continued, commenting, "[Y]ou know, . . . if what she's saying is true, you shouldn't take the test." Only at this point did Defendant offer his version of the events. Looking at the circumstances surrounding the confession, we note that Defendant was already incarcerated on other charges and was being held in the attorney room at the courthouse. We have already determined there is no question that Defendant was in custody or that he had invoked his right to counsel. It is not necessary for us to determine whether merely asking whether Defendant would be willing to take a lie detector test qualifies as a question that a police officer should have known was reasonably likely to elicit an incriminating response in the *Innis* sense. However, when Detective Newman continued to comment that Defendant should not take the test if he committed the acts as alleged by the victim, the words of the officer were, in our opinion, likely to elicit an incriminating response. Therefore, this statement, made by Detective Newman after Defendant invoked his right to counsel, constituted custodial interrogation, especially in light of the fact that there was no distinct separation in time from the request for counsel and the

---

[7] Interestingly, the "questioning" need not even come directly from the government in order to constitute interrogation. *See, e.g.*, *Estelle v. Smith*, 451 U.S. 454, 467 (1981) (questioning by court-appointed competency psychiatrist found to implicate the defendant's *Miranda* rights); *Wilson v. O'Leary*, 895 F.2d 378, 380-81 (7th Cir. 1990) (holding *Miranda* applicable where sheriff detained defendant against his will in a vacant lot so husband of victim could interrogate defendant). *Cf. Arizona v. Mauro*, 481 U.S. 520 (1987) (recorded meeting with wife after defendant invoked right to counsel was not the type of psychological ploy designed to constitute interrogation).

statements by the officer. In fact, Detective Newman testified that a mere three to four minutes elapsed from the invocation of counsel to the confession. Defendant's confession to Detective Newman was initiated by the detective's question and comment about the lie detector test. When Defendant responded to those statements, he specifically commented that he did not want to write anything down or sign anything, indicating his perception that he was under continued interrogation by the officer. We conclude that the statements made by Detective Newman violated Defendant's Fifth Amendment right to counsel, rendering Defendant's subsequent confession inadmissible. Consequently, we adopt the factual findings of the trial court as to what happened, but we reject the trial court's conclusion of law that those facts did not amount to a violation of the Fifth Amendment.

*Harmless Error*

Having determined that statements made by Defendant during custodial interrogation should have been suppressed as a result of the *Miranda* violation, we must next determine whether the erroneous admission of these statements requires reversal of Defendant's conviction. *Climer*, 400 S.W.3d at 569. In conducting harmless error analysis, this Court has identified three categories of error: (1) structural constitutional error; (2) non-structural constitutional error; and (3) non-constitutional error. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to the harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 295-96 (1991) (holding that the admission of a coerced confession is subject to harmless error analysis and recognizing that federal circuit courts of appeal have held that the introduction of statements elicited in violation of *Miranda* is subject to harmless error analysis); *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008); *State v. Bates*, 804 S.W.2d 868, 876 (Tenn. 1991); *Koffman*, 207 S.W.3d at 320. Non-structural constitutional errors do not require automatic reversal. *Rodriguez*, 254 S.W.3d at 371. "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." *Id.* The test is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation marks omitted); *see also Neder v. United States*, 527 U.S. 1, 15 (1999); *Chapman v. California*, 386 U.S. 18, 24 (1967).

The State's brief on appeal does not address whether the admission of Defendant's statements was harmless error presumably because the State concludes that Defendant voluntarily waived his rights and continued the conversation with the detective. Defendant, on the other hand, posits that the State's case rested squarely on Defendant's confession and that the confession was merely corroborated by the victim's testimony. While Defendant took the stand and denied the allegations, we note that there was no

other tangible or direct evidence as to guilt or innocence. While we recognize that a guilty verdict may rest entirely on circumstantial evidence, *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), our determination of this issue does not turn on whether the remaining admissible evidence was sufficient to support the conviction for incest. Instead, we must determine "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Climer*, 400 S.W.3d at 570 (quoting *Rodriguez*, 254 S.W.3d at 371 (internal quotation marks omitted)).

A confession by a defendant has been described as "probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)); *see also Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brennan, J., dissenting) (observing that "[t]riers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous" (internal quotation omitted)); *Miranda*, 384 U.S. at 466 (Harlan, J., dissenting) (explaining that a confession is "the most compelling possible evidence of guilt" (citing *Mapp v Ohio*, 367 U.S. 643, 685 (1961)); *Hopt v Utah*, 110 U.S. 574, 584-85 (1884) (recognizing that a "voluntary confession of guilt is among the most effectual proofs in the law"); *Deathridge v. State*, 33 Tenn. 75, 78-79 (1853) (noting that "[g]reat weight and credit are justly due to a confession" that is "free and voluntary" because "we are to presume, in the absence of influence and motive, a person who is innocent of crime will not confess himself guilty").

Excluding the confession, the remaining evidence of Defendant's guilt could hardly be said to be overwhelming. Save the victim's testimony as to the events that took place at the house, nothing else points to Defendant's guilt. We conclude, after reviewing the record, the State failed to establish beyond a reasonable doubt that the erroneous admission of Defendant's statement did not contribute to the verdict. As noted in *Climer*, the State is not precluded from retrying Defendant for incest. At any future trial, Defendant's statements to Detective Newman would be inadmissible in the case-in-chief, but could be admissible for impeachment purposes should Defendant take the stand at trial. 400 S.W.3d at 571 (citing *Harris v. New York*, 401 U.S. 222, 224-26 (1971) (stating that voluntary statements elicited in violation of *Miranda* are inadmissible in the prosecution's case-in-chief but may be used to impeach a defendant's credibility)). Accordingly, we reverse the judgment of the trial court and remand for a new trial.

*Sufficiency of the Evidence*

Defendant complains that the evidence was insufficient to support the conviction because there were no documents confirming the familial relationship, no physical evidence of the penetration, and no direct testimony to corroborate the allegations of the victim. Despite our determination that the confession was improperly admitted, we are

obliged to review this issue with the evidence as presented at trial in the event of further appeal.

The standard of review for sufficiency of the evidence is whether "after considering the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000) (quoting *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999)). Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

In this case, the evidence was sufficient to sustain a verdict for incest—sexual penetration, including fellatio, with a person's sister "of the whole or half-blood." T.C.A. §§ 39-15-302(a), 39-13-501(7). The victim's mother testified that she was also the defendant's mother, establishing the relationship between the victim and Defendant. The victim testified the incident occurred around Thanksgiving and that at first she tried to struggle with Defendant and that she gave in to "get it over with." The victim explained that during the incident, Defendant stuck his penis in her mouth and ejaculated in her mouth. A victim's testimony alone is sufficient to support a conviction. *See, e.g.*, *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Defendant denied the allegations. The jury's role was to view the witnesses and assess their credibility. After doing so, they found sufficient evidence of guilt, accrediting the State's witnesses. The evidence was sufficient to support the conviction.

*Prior Bad Acts*

Next, Defendant complains that his testimony that nothing ever happened between him and the victim did not open the door to rebuttal testimony by the victim. Specifically, Defendant argues that the victim was allowed to testify about uncharged instances of criminal sexual conduct by Defendant in violation of Tennessee Rule of Evidence 404(b). The State insists that Defendant opened the door to the testimony. We are obliged to address the issue in the event of further appellate review in this matter.

Prior to trial, Defendant filed a motion in limine seeking to exclude evidence of "uncharged sexual conduct." Attached to the motion was a copy of the victim's statement in which she alleged Defendant first touched her at the age of seven, by grabbing her breasts as well as touching and licking her vagina. The appellate record does not contain an order disposing of the motion or a transcript of the hearing on the

motion. Defendant objected to the rebuttal testimony of the victim but did not request a 404(b) hearing.

Evidence of a defendant's prior crimes, wrongs, or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a criminal defendant's previous misconduct may become admissible when it logically tends to prove material issues such as: (1) the use of "motive and common scheme or plan" to establish identity, (2) to establish the defendant's intent in committing the offense on trial, and (3) to "rebut a claim of mistake or accident if asserted as a defense." *McCary*, 922 S.W.2d at 514. In order for such evidence to be admitted, the rule specifies:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

In reviewing a trial court's decision to admit or exclude 404(b) evidence, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See DuBose*, 953 S.W.2d at 652.

In this case, Defendant objected to the rebuttal testimony but did not request a 404(b) hearing. Defendant's brief references a pretrial hearing, but this hearing is not

- 16 -

included in the record. It is the burden of the Appellant to prepare a full and complete record for appellate review. *See* Tenn. R. App. P. 24(b). Absent an adequate record, we are unable to review this issue unless there is plain error. In order to obtain plain error review, the defendant must show that:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. Because trial counsel did not request a 404(b) hearing, it is not apparent that the trial court breached a "clear and unequivocal rule of law" by failing to follow the procedures of 404(b). The rule states that the trial court must hold a jury-out hearing upon request. Tenn. R. Evid. 404(b)(1). While a trial court may sua sponte conduct a hearing, the language of the rule indicates that "the trial court was not obligated to conduct such a hearing absent a request." *State v. Hall*, 958 S.W.2d 679, 707 (Tenn. 1997) (app'x); *see also State v. Jones*, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) (declining to consider whether evidence should have been excluded pursuant to 404(b) when the defendant failed to request a 404(b) hearing). Because the defendant did not request a 404(b) hearing, the trial court was not obligated to conduct one. Because the defendant has failed to show all five plain error factors are satisfied, we need not consider the remaining factors. Defendant is not entitled to any relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is reversed and remanded for new trial.

_____
TIMOTHY L. EASTER, JUDGE